Good morning, ladies and gentlemen. Our first case for argument is Rush v. GreatBanc Trust Company. Ms. Hopkins. Good morning, and may it please the Court. My name is Elizabeth Hopkins, and I'm here on behalf of the Plaintiff Appellant, Bruce Rush, and the certified class that he represents. I'd like to reserve five minutes of my time for rebuttal, if I may. This class action lawsuit arose out of the sale of 100% of the assets of an employee's stock ownership plan through the sale of Sagerdahl Corporation, which in turn was entirely owned by the ESOP. In some sense, this ESOP was a resounding success story, until it wasn't. When it came time to sell the company and terminate the ESOP, which had done very well over the 13 years of its existence, the Board of Directors, two of whom were the named fiduciaries of the ESOP and the ESOP's trustee, GreatBanc, engaged in a flawed and conflicted process that resulted in a sale that did not serve the interests of the plan participants because it didn't reflect the full value of the stock. Following a bench trial, the district court ruled that the board members and the trustee did not violate any of their fiduciary duties under ERISA. This was clear error for a number of reasons that we detail in our briefs, any of which I'd be happy to answer questions about, but I'd really like to, in the time allotted, focus on three overarching legal errors that together really affected all of the court's findings and that therefore require reversal. First, the district court's erroneous conclusion that the Sagerdahl Board of Directors and the members of the boards were not acting as fiduciaries in their role with respect to the sale of the ESOP stock assets. Second, the district court's erroneous application of deferential review in reviewing the prudence and loyalty of the actions of the board and the trustee. And third, if I have time, the district court's conclusion and erroneous holding that the fair market value of the stock was irrelevant to the damages inquiry. So first, on the fiduciary status of the board and its members, the most salient point, I think, is that the sale was not a corporate transaction. It was plainly and simply a sale of the ESOP shares of Sagerdahl. No one else owned shares of Sagerdahl, and it was only the plans assets that were being sold in this transaction. Under the definition of ERISA's functional definition of a fiduciary, the board was acting as a fiduciary in this transaction because, to put it in statutory terms, they acted with authority and control respecting the management and disposition of plan assets. That's what the sale was about. They also acted as fiduciaries because they had the authority to appoint and then the duty to monitor and remove the other actors with respect to the sale. And they did so. They appointed the trustee. Great thing. And they appointed the name plan administrator, first Mr. Jutras and then Ms. Schneider. From beginning to end, the board members were intimately involved in every aspect of the marketing and sale of 100 percent of the plan's assets. And the district court's conclusion that this was somehow too ancillary and not a fiduciary activity subject to ERISA's exacting fiduciary standards is clear and reversible error. In concluding that the marketing and sale of the ESOP stock and the company was not an ERISA fiduciary duty, the court mainly relied on the fact that Great Bank had the ultimate say with respect to the sale, which couldn't have taken place without Great Bank's approval. But interestingly, defendants don't really defend on this basis and for good reason. ERISA expressly contemplates that plans sometimes are, usually are, run by more than one fiduciary. And the failure to live up to fiduciary standards is subject fiduciaries to joint and several liability. In fact, just as the sale couldn't have taken place without Great Bank's approval, it really couldn't have taken place without the board's role in deciding how and when to market the stock and in actually negotiating the terms of the sale. Defendants instead point to statements by the court that the actions of a corporate officer are fiduciary only when they create a conflict between that officer's interests and the ESOP. The court and the defendants actually cite two cases for this proposition, but neither in any way supports that the direct involvement of corporate officers in the sale of 100% of an ESOP stock is not a fiduciary activity. First of all, the unpublished decision from the Northern District of Illinois in Godfrey involved a corporate reorganization that plaintiffs in that case claimed diminished the value of their ESOP. And the court there actually held that it plausibly involved the control of overplanned assets as so stated. I don't think we need to discuss unpublished district court decisions. They don't have any authoritative effect. But the Supreme Court's decision in Pegram against Herdrich is authoritative, and the district court relied on it. You might want to discuss it. Yes, I would like to discuss it, Your Honor. I think it's even less relevant, to be frank, than the Godfrey decision because it involved claims of fiduciary breach against physician owners of an HMO. And the Supreme Court there really pointed out that the relevant question is whether the defendants were acting as fiduciaries when taking the actions alleged in the complaint. Exactly. So the Supreme Court establishes the basic rule. The district judge holds a bench trial, and the district judge finds that these people were acting on the managerial side rather than the fiduciary side. How is that a legal error given that it applied the Supreme Court's own framework? It misapplied the Supreme Court's framework, Your Honor, because they were undertaking to market and sell the plan's assets, 100% of the plan's assets. That was the only ownership interest that was being sold here. In that capacity, they weren't acting both as corporate officers. I know that's your argument, but you need to persuade us that the district court committed a clear error in drawing a line that the Supreme Court says district judges are supposed to draw. Yes, Your Honor, but I don't think this is really a factual issue because there's no debate that all that was being sold were the ownership interests of the ESOP. And under the statute's own plain terms, which sets forth this functional definition of what a fiduciary is, the disposition of plan assets is a fiduciary function. So, therefore, it seems pretty apparent under the plain language of the statute that this falls on the fiduciary side of the PGRM and any other decisions that follow PGRM. And, in fact, Martin v. Filum is particularly on point in this regard, where the Eighth Circuit, I know it's not this circuit, but the Eighth Circuit said that corporate entities were fiduciaries when they recommended actions and structured deals with respect to the ESOP. Here, you know, it's even more direct that the disposition of plan assets was what was taking place here, and under ERISA's definition of fiduciary, that's fiduciary activity. Just also point out that case after case from this circuit and from others correctly recognize that ERISA's fiduciary status provision should be read broadly. So I'd like to turn, unless you have more questions about fiduciary status, to the deference issue, where, unfortunately, I think the district court also missed the mark in concluding that it was required under this court's decision in Armstrong v. LaSalle to consider both the prudence and loyalty of defendants' actions under an abuse of discretion standard, and, in fact, one that was akin to the business judgment rule from corporate law. This is a misapplication of Armstrong for four reasons. First, Armstrong rejected deference where a fiduciary is conflicted. Here, the board members had significant conflicts of interest because they had just been told they faced millions of dollars in personal liability if the ESOP were to continue, and the board set goals from the outset for the sale, and these goals carried through to the fairness opinion that did not include obtaining the best price for the stock but rather stressed maintaining management post-sale. Ms. Schneider was even more directly conflicted because she was going to work for the buyer after the sale, ICB partners, and she was going to invest and was required to invest a set amount in the post-sale company, so the lower the sale price, the more shares that she would be able to purchase. This is a direct pecuniary conflict. Her interests in that respect were directly contrary to the ESOP's interest in obtaining the best price. This court's decision in Lay v. Engel addressed and found conflicts in this kind of a situation where fiduciaries were concerned with preserving their employment. Given these conflicts, Armstrong precludes rather than requires deference, and second, Armstrong also rejected expressly application of the business judgment rule in concluding that fiduciaries are not business persons charged with acting boldly but are professionals charged with acting with discretion and care in managing the plan and its assets, but the district court referred to an applied business discretion throughout the decision, particularly when discussing whether the fiduciaries acted prudently in paying out in-service distributions over four years rather than in a lump sum as required by the plan and under the Internal Revenue Code, and also when discussing whether Mr. Berganini, who negotiated the deal for Great Bank, acted imprudently in disclosing the 2015 valuation to ICB partners. Third, nothing in Armstrong, or any other decision for that matter, supports deference when considering loyalty, but the district court here applied deferential review to the fiduciary breach claims as a whole at Act 39, both the disloyalty claims and the imprudence claims, and deference is just inconsistent with loyalty, which requires a fiduciary to act with an eye single to the interests of participants and beneficiaries. And fourth, Armstrong stated that it was appropriate to defer to the decision of a fiduciary that has a balancing act to perform in considering the interests of various sets of participants, particularly where one set of participants has an interest that's contrary to another set of participants. Even this statement was dicta, frankly, because the Seventh Circuit ultimately decided that no deference was due to LaSalle because it wasn't clear that LaSalle had exercised any discretion in setting a high valuation price for the stock in that case, but in any event, here there was no balancing act to perform because all of the participants had the exact same interest in obtaining the highest possible price for the stock. For all of these reasons, deferential review is unwarranted and clear error that requires reversal of all of the district court's findings with respect to fiduciary breach and remand for reconsideration under the correct plenary standard of review. And finally, the district court also unfortunately committed clear error with respect to damages. The court improperly rejected the damages report of plaintiff's expert Daniel Van Vliet and ignored his conclusions because his report focused on fair market value and was not premised on what a real world buyer would have paid at the time of the sale. But fair market value, which tries to model what a willing buyer would pay a willing seller, is a widely used method of determining damages and value, frankly, in a variety of contexts, including in ERISA cases where the actual sales price or other indicia of value are lacking. It was appropriate here where plaintiffs presented strong and in some cases unrebutted evidence of self-dealing and flaws in the process. But even without such evidence, it would be an appropriate method to gauge whether the price obtained for closely held stock in the sale to ICB partners at a point at which all other sellers had dropped out represented the true value of the company's stock. Unless the court has any questions at this point, I'd like to reserve my remaining time for rebuttal. Certainly, Counsel. Okay. Thank you, Your Honor. Mr. Schema. Good morning. Thank you for entertaining us here today, Honorable Judges. I have 15 minutes' worth of material, but I think Judge Wood's lengthy, well-reasoned opinion speaks for itself. I think I do a disservice to her strong work and hard work and reasoning there by trying to put a lot of additional gloss on it. What I would like to emphasize for the court this morning— One wonders, therefore, why you bothered to file a brief. Duly chided, Your Honor. Several things I'd like to emphasize for the panel as you consider this. One, there's 67 pages of Judge Wood's opinion on how the sale went down at a very general level. It is clear that the trial evidence showed that there was complete alignment of interests among all of the players that were involved in the case. And that's important here because that goes to fact-finding. And there's a couple of sort of punchlines that I'd like to read just to emphasize. In particular, there are three outside directors, Rodney Goldstein, Robert Cronin, Peter Mason. That is a majority of the board. You could exclude the other, quote-unquote, conflicted, allegedly conflicted members of the board of directors and still have a controlling majority that agreed to approve this sale after the judge found that their interest in stock appreciation rights gave them 100 percent full alignment with the interests of the ESOP and the interests of the ESOP's participants. So there is complete alignment between their financial interests and their legal duties. She also found that the same was true of Rick Jutras and Mary Lee Schneider who sort of bear the brunt of plaintiff's attack in this transaction. Plaintiff does have a point that fiduciary status can be shared. That is correct. Yes, Your Honor. Among multiple people, multiple parties, entities. So just because a great bank is a fiduciary doesn't mean that Jutras and Schneider can also be a fiduciary. What's your response to that? So, yeah, I think that's probably correct and there probably are portions. The moment of the sale, you know, and I mean no disrespect, in my view it's an academic point, I guess I would say, in the sense the moment of the sale where the transaction was approved, that's great bank. There are colorably fiduciary duties in the sales process leading up to the sale that great bank approved. There is some room for debate, if you will, about whether the board activities or the board's conduct was undertaken in a corporate capacity or fiduciary capacity. But then coming back to my opening remarks about emphasizing certain aspects of Judge Wood's ruling, she found, as a matter of fact finding, putting aside all of the trappings of the academics and so forth, she found that you had three out of five unconflicted fiduciaries, and by that I mean the special committee and the outside directors, who would have carried the day one way or another. She also made a very specific fact finding that Mary Lee Schneider, who was one out of five, there was no logical or there was no evidence that she did and no logical basis to infer that she could have manipulated them. So at the end of the day, the outside directors, and my colleague's brief addresses this, the outside directors did the right thing whether you judge them by corporate fiduciary standards or ERISA fiduciary standards. The end result is the same in that they are trying to maximize value. They make more money. In fact, when I stood before Judge Wood, a little bit lower in this building, at the beginning of the trial I went through and explained each one of the individual defendants' interests in the sale, and I repeated the refrain, when the ESOP did better, they did better. So, Your Honor, yes, there probably is room to debate, and obviously that's the charge under Article III for this panel to make a determination if they feel like it's important to reach a holding. In our view, the fact finding is that regardless of a corporate or ERISA fiduciary capacity, their interests were fully aligned. The Court specifically said that if you look at, let's see, there's at page 37 of the trial ruling, the Court concluded as a matter of fact finding, this goes to the standard review, by the way, too, where there is no conflict, you defer. There's fact finding. You don't get into any sort of burden shifting. The Court concludes that the defendants had no such conflict of interest. There is no indication, and then Judge Wood goes through at page 37 and speaks of the potential conflicts, and you can tell, I mean, it was kitchen sink time at trial, Your Honor. If you look at the list of plaintiff's exhibits, there's a modest number of joint exhibits, a similarly modest number of defense exhibits, and then some lengthy list of plaintiff's exhibits where they're trying to muddy these waters. The Court saw through that and ultimately said when she reviewed the potential conflicts that the plaintiffs are asserting, this is a quote at page 37, no indication that any potential conflicts affected the board's decision making. So the Court said no conflict, and the Court said even the potential conflicts would not have affected the outcome. Neither of these fact finding exercises by Judge Wood have been challenged on appeal. They are reviewed for clear error, and the record quite amply supports that. So the status issue to me, if I had the honor of being on the bench, I don't know that I would get bogged down in that issue. I would start with the fact finding, and then I'd also look at, and to some extent I'd like to address a comment that Ms. Hopkins made about the fair market value. There was also one complete and independent basis for affirmance that doesn't get bogged down in the status issue at all, and that is lack of proof of damages. There were three basic concepts that the plaintiffs put out there as a measure of damages. One, there was a meeting where Jeff Bergamini, the investment banker, who was in charge of the sale, again, the Court found Mr. Bergamini was very experienced, he was very good at his job, he did a very diligent, intensive work effort, successfully got ICV. Before we run out of time with the three concepts that you wanted to summarize for us, on this damages question, why wasn't the Court engaged in circular reasoning when the Court said that fair market value is what ICV paid for Cervidal? So fair market value as a concept is what, so normally you look for actual damages under ERISA, Section 50282 says look at Section 409 of ERISA, and you look for losses to the plan. Fair market value typically only has a place in party and interest transactions if the ESOP had sold to Rick Jutraszek, or the ESOP had sold the company to Mary Lee Schneider or the board, that's a party and interest transaction. There is no market-based dynamic. What the fact finding that the Court did was establish that there was, in fact, a market-based dynamic, and Ms. Hopkins said it herself when she was up here a moment ago. She said Armstrong talks about fair market value becoming relevant when other indicia of value are lacking. That's a quote. I wrote that down. Other indicia of value are lacking. Well, we have indicia of value here, plentiful indicia of value. A fully incentivized board with interests aligned with ESOP going to market, making a justifiable, reasonable decision. Again, fact finding that's reviewed only for clear error. Justifiable decision not to shop to strategics because it increased the risk with no appreciable prospect of return for ESOP participants. They go to market. They identify 18 buyers, whittle it down to five or six, go through due diligence, several drop out, and then they end up with an actual buyer. And when you have an actual buyer where you have an unconflicted market-based pricing mechanism, fair market value as a hypothetical construct is no longer useful to the court either here or below because you have other indicia of value, to borrow Ms. Hopkins' phrase. So in my view, fair market value is not relevant, and Judge Woods correctly so concluded. I don't want to cut into Mr. O'Neill's time. He may have a few words he'd like to say, so unless you want to hold me up here, I'm going to go. I'm going to get while the getting's good. Thank you very much, Your Honor. Mr. O'Neill. Good morning. My name is Bill O'Neill, and I represent the three outside directors, Bob Cronin, Rod Goldstein, and Peter Mason. I'd like to spend just a few minutes to separately address why the district court's decision should be affirmed as to my three clients, the outside directors. As a starting point, the district court's written judgment's incredibly thorough and detailed. The district court heard testimony for three weeks and then meticulously analyzed the evidence. The court weighed the evidence, made credibility determinations, and did exactly what a trial court should do, made judgment calls. Ms. Hopkins disagrees with those judgment calls, but that's not the basis for reversal. The district court made key factual findings that are the death knell of plaintiff claims against the outside directors. Can you hone in on Mason with a few of your seconds? Sure. Because the district court did note that she was troubled, that he served on the board while his firm was representing Siegertal. So what's your best argument for why that was not a conflict giving rise to a fiduciary violation? So my best argument is there was extensive testimony taken from multiple witnesses on that point, and there was a factual finding that can only be reviewed by this court for clear error. The factual finding that Judge Wood made was correct. The law firm of Freeborn and Peters, which Mr. Mason had worked for, was let go. They were unretained by the company. They were not selected to lead the company in the sale process. The company had different legal counsel that was used for the process, and so he had a legacy relationship as a prior counsel, but during all the events in question that related to the sale, that law firm had nothing to do and didn't perform any legal services related to the sale, which is why Judge Wood's factual determination on that issue, I think, was correct and not clearly erroneous. The district court found that the outside directors were superbly qualified, and that finding was supported by significant evidence that the plaintiffs do not dispute on appeal. The outside directors had 100 years of cumulative board experience in the printing industry and abundance of private equity and M&A experience. Second, the district court found that there was, quote, no evidence from which to conclude the outside directors were conflicted. Plaintiffs disagree with that factual finding, but to reverse, it must be clearly erroneous, and plaintiffs come nowhere close to meeting that standard. As the district court correctly ruled, the interests of my clients were perfectly aligned with the ESOP's interests. The higher the sale price, the better for the ESOP and the better for my clients, but the financial interests are beside the point. All three outside directors testified convincingly and credibly that their sole interest was to maximize value, and full stop and Judge Wood accorded that testimony considerable weight. I see that I'm out of time, so I will yield to Ms. Hopkins for rebuttal. Thank you, counsel. Ms. Hopkins, anything further? Yes, Your Honor. Ms. Hopkins, before you start, can I ask you a question with regard to Ms. Schneider? The district court found that with regard to the post-sale investment, that actually ICV wanted her to invest 100% of the revenue she generated from her SARs, and she negotiated down to 50%. How is that compatible with your theory that all along she was working in order to lower the investment price that she would have to pay for the new entity? Well, even if one assumes that she was required to invest and it wasn't her choice or she was happy to invest 50% rather than 100%, it's still the case that the lower the price of the stock, the more she'll be able to invest. But she retained, but let's say she was asked, Judge Eastbrook, if I may? Let's say that she was required to invest 25% of her SAR revenues, okay? On balance, wouldn't the fact that the price had been higher benefited her because she would have retained 75% of whatever that margin increase would have been and just given up the 25%? And so I still don't understand how the dynamics of negotiation of that investment kind of is consistent with your theory that she was working to somehow undermine the sale price. Yes. Well, I mean, I think you have to take it in the context of what actually happened in the case, which was that at the very beginning of the sale, the board of directors set out five criteria for finding a buyer. I'd say four out of five of the criteria were all about how the company was going to be managed post-sale and whether management was going to be retained. In that context, and the fifth factor was probably a legitimate factor from the point of view of the ESOP. It was whether the potential buyer could go through with the sale. So that was a legitimate factor, but the rest of them were not legitimate factors that were relevant to the ESOP's interest in maximizing prices. So, you know, you couple that with the fact that she is going to, you know, she's going to go to work for the buyer and that she does, in fact, invest a significant amount in the buyer. All of those things, I mean, it's true, like a lot of real world people, you know, the board of directors had interests, various interests, and some of them, you know, pointed in different directions. Right. It's true that the SARs, the interest that they had in their SARs, their stock appreciation rights aligned with the ESOP's interest. But those goals that they set out show that, in fact, they acted on the competing interests they had in maintaining management of the company. Okay. Thank you. And that, to me, is the most relevant factor. And, you know, the investment supports that. Thank you, Ms. Hopkins. All right. Thank you. The case is taken under advisement. Okay. Thank you.